FLANAGAN STATE BANK, Ex'r of the Last Will of John W. Albrecht, Deceased, Petitioner and Counterdefendant, Appellee, v. BroMENN HEALTHCARE, Respondent and Counterplaintiff-Appellee and Cross-Appellant (Neil Hartigan, Attorney General, *et al.*, Respondents-Appellants and Cross-Appellees).—FLANAGAN STATE BANK, Ex'r of the Last Will of John W. Albrecht, Deceased, Petitioner and Counterdefendant-Appellant, v. BroMENN HEALTHCARE, Respondent and Counterplaintiff-Appellee (Neil Hartigan, Attorney General, Respondent-Appellant; The Sisters of the Third Order of St. Francis, Respondent).

Fourth District   Nos. 4—85—0003, 4—85—0020 cons.

Opinion filed January 2, 1986.

138

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Edward M. Kay, Assistant Attorney General, both of Chicago, of counsel), for appellant Neil F. Hartigan.

Joseph F. Bartley, Jr., and Vance C. Parkhurst, both of Bartley, Fraser, Parkhurst & Hession, of Peoria, for appellant Sisters of The Third Order of St. Francis.

John A. Taylor and Taylor F. Johnson, both of Johnson & Taylor, of Pontiac, for Flanagan State Bank.

Gale Saint & Associates, of Bloomington (John R. Bailen, of counsel), for appellee BroMenn Healthcare.

JUSTICE TRAPP delivered the opinion of the court:

Flanagan State Bank (the trustee), as executor and trustee under the will of John W. Albrecht, deceased, brought this action in the circuit court of Livingston County, to reform the provisions of the trust (1) to allow for annual distribution of income, (2) to avoid classification as a private foundation, and (3) to obtain a finding that the consent of BroMenn Healthcare (BroMenn) (former Mennonite Hospital) a contingent beneficiary, was not necessary in order to amend the trust. BroMenn filed a counterclaim, seeking to set aside the trustee's designation of The Sisters of The Third Order (The Sisters) as the beneficiary of the trust. The circuit court allowed the amendments to the trust, set aside the trustee's designation of The Sisters as beneficiary, and imposed certain requirements for the selection of the beneficiaries of the trust. The trustee, The Sisters, and the Attorney General appeal. BroMenn cross-appeals.

John W. Albrecht, the decedent, was a lifelong resident of Livingston County. His only marriage was of short duration, ending in divorce, and he had no children. The decedent died November 23, 1977, leaving a last will dated September 5, 1961, and a codicil thereto dated March 14, 1974. The Flanagan State Bank was appointed executor. The decedent's estate had a fair market value of $8,892,000 as of the date of his death and consisted principally of farmland.

The decedent's will and codicil thereto provide for the establishment of a charitable trust. Pursuant to the terms of the trust, the income is to be accumulated for 20 years and added to the principal. The terms of the trust further provide that the real estate shall be retained by the trustee for 20 years following the decedent's death. The will provides for the disposition of the trust estate as follows:

"I direct that my said trustee shall within fifteen years from the date of my death select a charitable organization or trust which qualifies as a charitable deduction for Estate Tax under U.S. Internal Revenue Laws and qualifies as a charitable deduction under Inheritance Tax laws of the State of Illinois, said charitable organization or trust to be one which operates a hospital in Livingston County or Woodford County, Illinois, or a charitable organization or trust, one of the purposes of which is to operate a hospital in Livingston County or Woodford County, Illinois. I further direct that twenty-one years after my death this trust shall terminate and the net proceeds of sale of my trust estate shall be paid by my said trustee to said charitable organization or trust selected as herein provided by my trustee.

I further direct that said charitable organization or trust shall use said net proceeds as it sees fit, provided said proceeds shall only be used to purchase, build, repair, remodel, maintain or operate a hospital at the location and in accord with selection made by Trustee as herein authorized, said net proceeds or hospital to be known as 'John W. Albrecht Memorial Fund' or 'John W. Albrecht Memorial Hospital.'

I hereby declare that it is my hope and desire and I direct that the hospital established or to be established by the charitable organization or trust selected by my trustee will be located in Livingston County, Illinois, near the Village of Flanagan, Illinois. In the event that my said trustee, at the time of selecting said charitable organization or trust deems it unwise or impractical to so locate said hospital, then I hope and desire and I direct that said hospital established or to be established be located in Woodford County, near Minonk, Illinois, or at such a location as may be selected by my said trustee in either Livingston or Woodford County that my trustee would feel well suited for the service of both of said communities.

In the event that my trustee in its sole discretion feels that it is unwise or impractical to locate said hospital in any of the locations directed hereinabove, then I direct that twenty-one years after my death my said trustee shall pay over said net proceeds to the Mennonite Hospital at Bloomington, Illinois, to be used by it for Hospital purposes as it sees fit."

In the codicil to his will, the decedent authorized the trustee to select a home for aged persons in Livingston or Woodford Counties, rather than a hospital, depending on which is more needed. Mennonite Hospital is identified in the will; it is a party to this proceeding under its

present name, BroMenn Healthcare; and is located in McLean County.

The decedent's will was executed on September 5, 1961, prior to the Tax Reform Act of 1969, which began imposing stringent requirements on private foundations. The trust, as established under the terms of the decedent's will, is a private foundation.

Private foundations are broadly defined as all organizations exempted from tax by section 501(c)(3) of the Internal Revenue Code (Code) (religious, charitable, educational, et cetera, organizations), except for four specified exceptions. (26 U.S.C. sec. 509(a) (1982).) Those exceptions are churches, educational institutions, hospitals, certain publicly supported organizations and "supporting organizations" of such publicly supported organizations.

Classification as a private foundation is burdensome. Private foundations, their managers, and certain other persons dealing with the foundation are subject to excise taxes for certain prohibited acts or failures to act. (26 U.S.C. sec. 4941 (1982).) Private foundations having assets of $5,000 or more must file annual informational tax reports. (26 U.S.C. sec. 6033 (1982).) Section 4940(a) of the Code imposes an excise tax of 2% on net investment income of private foundations. 26 U.S.C. sec. 4940(a) (1982).

Most importantly here, section 4942 of the Code imposes an excise tax on the undistributed income of a private foundation. (26 U.S.C. secs. 4942(a), (b) (1982).) If a private foundation fails to currently distribute the required amounts, an initial tax and an additional tax are imposed. The initial tax is imposed in the amount of 15% on any part of the distributable amount remaining undistributed at the beginning of the second taxable year (and each succeeding taxable year). If any portion of the distributable amount remains undistributed at the close of the taxable year, an additional tax of 100% of the amount involved is imposed. (26 U.S.C. sec. 4942(b) (1982).) In order to avoid these confiscatory taxes, reform of the governing instruments is authorized by State statute.

Under "An Act to conform certain charitable trusts to the requirements of the Federal Tax Reform Act of 1969" (Charitable Trust Act) (Ill. Rev. Stat. 1981, ch. 148, par. 51), a trustee of a trust which is a private foundation is directed to annually distribute the income in order to avoid taxes imposed on undistributed income under section 4942 of the Code. (Ill. Rev. State. 1981, ch. 148, par. 51(1)(b).) The Charitable Trust Act also authorizes the trustee to amend the terms of the trust to avoid private foundation status under section 509(a)(3) of the Code. The Act provides that the trustee may "release any power contained in the governing instrument, may reduce or limit the

charitable organizations or classes of charitable organizations in whose favor a power to select may be exercised and may appoint new and additional trustees." Ill. Rev. Stat. 1981, ch. 148, par. 51(2)(c).

The amendments to the Albrecht will proposed by the trustee sought to qualify the trust as a "supporting organization," thereby avoiding private foundation status. A supporting organization under section 509(a)(3) is exempt from private foundation status. (26 U.S.C. sec. 509(a)(3) (1982).) Section 509(a)(3)(B) describes the nature of the relationship which must exist between the organization seeking exemption from private foundation status as a supporting organization and one or more publicly supported organizations. The supporting organization must meet one of the following relationships:

"(1) Operated, supervised, or controlled by,

(2) supervised or controlled in connection with, or

(3) operated in connection with, one or more public charities." Treas. Reg. sec. 1.508(a)—4(f)(2) (1982).

Both of the first two relationships contemplate a common element of control between the supporting organization and the public charities, *i.e.*, the same persons supervise or control both the supporting organization and the public charity. (Treas. Reg. sec. 1.509(a)—4(f)(4) (1982).) The sort of relationship which the trust established under the decedent's will would likely qualify for would be that of "operated in connection with" a public charity. The charitable selection agreement between the trustee and The Sisters provides that the trustee intends that the trust be a supporting organization "operated in connection with" The Sisters.

In order to satisfy the relationship of "operated in connection with" a public charity, the supporting organization must meet both a "responsiveness test" and an "integral part" test. (Treas. Reg. sec. 1.509(a)—4(i) (1982).) The regulations governing the first test provide:

"In order to meet this test, either subdivision (ii) or subdivision (iii) of this subparagraph must be satisfied.

(ii)(a) One or more officers, directors, or trustees of the supporting organization are elected or appointed by the officers, directors, trustees, or membership of the publicly supported organizations;

(b) One or more members of the governing bodies of the publicly supported organizations are also officers, directors or trustees of, or hold other important offices in, the supporting organization; or

(c) The officers, directors or trustees of the supporting organization maintain a close and continuous working relationship

with the officers, directors or trustees of the publicly supported organizations; and

(d) By reason of (a), (b), or (c) of this subdivision, the officers, directors or trustees of the publicly supported organizations have a significant voice in the investment policies of the supporting organization, the timing of grants, the manner of making them, and the selection of recipients by such supporting organization, and in otherwise directing the use of the income or assets of such supporting organization.

(iii)(a) The supporting organization is a charitable trust under State law;

(b) Each specified publicly supported organization is a *named beneficiary* under such charitable trust's governing instrument; and

(c) The beneficiary organization has the power to enforce the trust and compel an accounting under State law." (Emphasis added.) (Treas. Reg. sec. 1.508(a)—4(i)(2)(ii), (iii) (1982).)

In *Quarrie Charitable Fund v. Commissioner of Internal Revenue* (7th Cir. 1979), 603 F.2d 1274, the court stated that in order to meet the "operated in connection with" relationship, the governing documents of the supporting organization must specify the beneficiary organization by name. See generally B. Hopkins, The Law of Tax-Exempt Organizations 374-81 (3d ed. 1979).

Prior to November 30, 1979, the trustee, then acting as executor, employed A.T. Kearney, Inc., management consultants, to assess the health care needs of Livingston and Woodford Counties. Throughout the period of estate administration, the trustee, cognizant of the tax problems, continued to explore alternative dispositions of the trust property. Approval of the Federal estate return was not received until June 16, 1981.

On October 2, 1982, the trustee petitioned the court to reform the will to qualify as a supporting organization under section 509(a)(3) of the Code. The amendments proposed by the trustee provided for the annual distribution of income to a charitable organization or a trust which operates a hospital or home for aged persons in Livingston or Woodford Counties. The Attorney General, representing the interests of the public, entered his appearance consenting to the amendment. On October 7, 1982, the trustee filed its finding that it is neither unwise nor impractical to locate a hospital or home for the aged in Livingston or Woodford Counties.

BroMenn Healthcare answered the complaint and counterclaimed, seeking to have the accumulated income distributed to it in default.

On August 4, 1983, the trustee filed a supplemental petition to amend the terms of the trust to incorporate the trustee's designation of The Sisters to receive both the annual income and the principal of the trust. The Sisters own and operate St. James Hospital in Pontiac, in Livingston County. Under the terms of the charitable selection agreement between the trustee and The Sisters, The Sisters agreed to build a medical clinic in Flanagan. The terms of the agreement further provide for the eventual construction of a new hospital facility to replace St. James Hospital situated in Pontiac, Livingston County.

BroMenn filed a second amended counterclaim alleging that the trustee's finding that it was not unwise or impractical to locate a hospital or home for the aged in Livingston or Woodford Counties was premature and based upon insufficient information and sought to invalidate the agreement between the trustee and The Sisters. BroMenn also sought distribution of accumulated income as contingent beneficiary.

On August 1, 1984, a hearing was held on the trustee's petition to amend the terms of the trust and on BroMenn's amended counterclaim. Don Wettstein, a vice-president and trust officer of Flanagan State Bank, testified that prior to making the decision to hire A.T. Kearney, Inc., to assess the health care needs of the area, two or three other such firms were interviewed. Wettstein stated that numerous contacts were made with hospitals and nursing homes in the area. In addition, the trustee employed Market Facts, Inc., to conduct a public opinion survey. Wettstein stated that the decision to distribute the income and principal to The Sisters to build a replacement hospital was based upon a review of all the information obtained, including opinions solicited from people in the community.

On cross-examination, Wettstein stated that it would not be possible to build the replacement hospital at the present time because of financing arrangements. In response to an inquiry by the court, Wettstein stated that, based upon the Kearney report, the Market Facts Survey, public input, and discussions with health care providers, the trustee did in fact compare the need for additional nursing home facilities with the need for additional hospital facilities, and in so doing, viewed that neither were to be given preference under the terms of the decedent's will or codicil.

Sister Frances Marie Masching, the executive vice-president of The Sisters, a not-for-profit corporation, testified that in addition to St. James Hospital in Pontiac, the corporation currently owns and operates five other acute general care hospitals and one continuation care and nursing home center in Illinois, Michigan, and Iowa. She also

stated that The Sisters is an exempt organization under section 501(c)(3) of the Code. Sister Masching testified that the current renovation of St. James Hospital is being undertaken to meet the requirements of the State fire department and the Public Health Department. The cost of the necessary renovation is in excess of $3 million. In addition, the planned renovation includes $500,000 for other improvements and $841,000 for equipment. Under the plan, the number of beds for the facility is being reduced from 118 to 89.

John Abdenshien, a consultant to the health care industry, who was employed by A.T. Kearney and was primarily responsible for preparing their report, testified that he received his graduate education in the field of health care planning and administration and also has a masters in business administration and a master of science and health services administration. He has worked in the health care planning field for many years, and was a vice-president of A.T. Kearney, Inc., an international management consulting firm with a major health consulting division, and served as the head of its national health care planning practice. He is present a partner in Ernst & Whinney and serves that firm in the same capacity. He is a fellow of the American Association of Hospital Consultants and a member of the board of that organization. He is also a member of the American Association of Health Planning. He has authored articles in his field and lectures frequently.

Abdenshien stated that their study was commenced with a review of the decedent's will and codicil thereto. They then proceeded to analyze the health care resources in the area—their availability, location, and access; and considered utilization trends, service demand patterns, and current and anticipated patterns. The opinions of local residents and of health care providers were also solicited. Data was also gathered from health care institutions and public agencies such as the State Department of Public Health. Throughout this five-month period, meetings were held with the trustee.

Although numerous alternatives were considered and discussed with the trustee throughout the study, Abdenshien stated that their ultimate recommendation, embodied in their report, was the construction of a replacement facility for St. James Hospital. A second potentially viable alternative identified was the construction of a continuum of care facility which would provide a range of services from basic independent living units to a skilled nursing care facility.

Explaining the priority given to the hospital, Abdenshien stated:

> "[T]here is a demonstrated need and usage for acute care services within the community and also there was a documented

range of deficiencies at the St. James Hospital relative to functional obsolescence, certain life safety code violations and other problems that warranted correction. And surveying St. James Hospital and reviewing appropriate documentation we also felt strongly that the site itself posed rather severe constraints in terms of reconstruction or remodeling. It is a constrained site with residences surrounding it and further its location is not particularly accessible to folks outside of the immediate Pontiac area. Also we took into consideration the fact of the thrust of population growth in the City was in a westward direction and the hospital was located away from that thrust of growth.

\* \* \*

\*\*\* [W]e looked at the retirement home consideration in a number of respects. We looked at it from the standpoint of potential interest within the community, and here the community was defined quite broadly to include the two county area, and also taking into consideration not only interest but ability to pay for such a facility. These are fairly costly types of facilities and not all residents can afford them or, in fact, pay for them. We also took into consideration certain factors relative to demand and potential economics of such a facility and in both instances came up with what I would consider a marginal and questionable feasibility for this type of facility. And surveying the individuals we found a light to moderate interest in the continuum care concept. We found a moderate to strong interest in the notion of replacing the local hospital facility \*\*\*."

The trustee then retained Ernst & Whinney to specifically study the feasibility of the continuum of care concept. Ernst & Whinney recommended that a qualified firm be employed to conduct a market survey. As a result, the firm of Market Facts, Inc., was retained. The survey consisted of a sample of 950 persons representative of communities of Livingston and Woodford Counties with an additional number of responses solicited from the community of Flanagan. Abdenshien stated that the survey indicated a light to moderate interest in a continuum of care facility and a moderate to high interest in a replacement hospital. Abdenshien stated that the occupancy rates of 60% and 70% for hospitals and of 90% for nursing homes cannot be effectively compared, because hospitals are subject to episodic usage and must have an excess available capacity.

Abdenshien testified that the planned site for the replacement facility, the junction of I-55 and Route 116, would serve many communities and would be very favorable. The replacement facility would addi-

tionally benefit the communities by attracting highly qualified professional staff. He stated that in his opinion, The Sisters could obtain the necessary approval from the State (a certificate of need) for the replacement facility.

Abdenshien described the current renovation of the St. James Hospital as a "Band-Aid" approach and stated that a hospital will probably need replacement or major alteration within a 20-year period.

On cross-examination, Abdenshien stated that he estimated the beneficial life span of the current renovation of the hospital facility to be 15 to 20 years. Although Abdenshien stated that at the time the report was completed he was not aware of The Sisters' plans for the current renovation, his decision concerning the need for the replacement of the facility would not be affected. Abdenshien also admitted that, in evaluating the existing facility of St. James Hospital, he did not analyze the functional requirements in depth nor did he develop alternative construction recommendations. In response to an inquiry by the court concerning the numerous questions that surround the future replacement of the hospital, Abdenshien stated that replacement of the hospital is the preferred option despite the current renovation.

Sister Masching, called as a witness by BroMenn, stated that one of the alternatives considered by The Sisters at the time the current renovation was proposed was the construction of a new facility. This alternative was listed on the certificate of need application which was filed with the Office of Health Facilities Planning Board on October 18, 1983, at an estimated cost of $21,916,300.

On cross-examination, Sister Masching stated that the alternative of building a replacement hospital for St. James at the present time was rejected because of financial reasons. She also stated that she was hopeful that additional money would be generated in the future and that it was the intent of The Sisters to build a replacement hospital in time.

Thomas B. Johnson, a partner in the management consulting division in the Chicago office of Touche Ross & Company, an international accounting and consulting firm, testified on behalf of BroMenn. Mr. Johnson has considerable experience in the health care industry, primarily in conducting financial feasibility studies for hospitals and hospital facilities. He is a C.P.A., a certified management consultant, and currently serves as the chairman of the American Institute of Certified Public Accountants' Management Advisory Services Task Force on feasibility studies. He is a member of the American Hospital Association, the Healthcare Financial Management Association, and the

Group Health Association of America.

Johnson testified that based upon a review of an inventory of acute care beds in the State of Illinois prepared by the Illinois Health Facilities Planning Board as of March 1982, estimates of population growth, and trends in utilization of health care facilities, there exists an excess of 241 acute care beds in the Bloomington planning area, which consists mainly of McLean and Livingston Counties. In addition, Johnson stated that information released from the Illinois Health Facilities Planning Board indicates that there is an excess of 60 long-term care beds in Livingston County and an excess of 135 long-term care beds in Woodford County.

Johnson criticized the report prepared by A.T. Kearney as deficient for failing to include any economic and financial feasibility analysis. Johnson stated that a financial feasibility analysis is necessary prior to obtaining a certificate of need from the State. Based upon the estimated construction cost of $21 million and allowing for increased construction costs, and upon the projected financial information contained in the certificate of need application filed by The Sisters in 1983 for the current renovation of St. James, Johnson determined that the construction would not be financially or economically feasible at this time. Johnson also stated that, in his opinion, there will be a decreased inpatient hospital utilization in the future, due to outpatient surgical procedures, home health care delivery, and reimbursement restraints imposed by Medicare. Johnson determined that it would be questionable whether a certificate of need would be issued for a replacement facility for St. James. Johnson testified that the expected life of the majority of the current renovation of St. James was stated in the certificate of need application filed by The Sisters to be 40 years.

On cross-examination, Johnson conceded that he has no background or expertise in acute care facilities as far as physical structures are concerned and that his testimony on direct examination was confined to analysis of financial information. He also stated that his calculations on financial feasibility were based on a borrowing of $15 million.

The evidence deposition of Ray Passeri, chief of the Division of Facilities Development and the Office Health Planning Board, was admitted into evidence. Passeri stated that the Health Facilities Planning Board administers the certificate of need program whereby permits are issued for the construction or modification of health care facilities. According to an inventory of health services prepared in 1974 by the Department of Public Health, there was an existing hos-

pital bed capacity of 201 with the need for beds identified as 137, yielding an excess of 64 acute care beds in the area to meet the needs of the population. On cross-examination, Passeri stated that the inventory prepared in 1982 only projected usage and needs until 1985.

In rebuttal for The Sisters, Steve Urosevich, the administrator of St. James Hospital, testified that the estimated cost of $21,900,000 for a replacement hospital for St. James included a medical office building in the amount of $2,087,500 and a convent and garage in the amount of $676,000. On cross-examination he stated that the estimated cost was based on an 111-bed hospital and that the cost for a facility with a reduced number of beds would be significantly less.

In surrebuttal for BroMenn, Johnson testified that he had revised his calculations in light of Mr. Urosevich's testimony to provide for a 90-bed hospital and also reduce the estimated cost by $2 million to reflect the elimination of the physician's office building. In his opinion, the construction of a replacement facility would still not be financially or economically feasible.

At the close of the evidence, BroMenn was granted leave to file an amended counterclaim to conform to the evidence.

The trial court found that the trustee had not acted fraudulently or in bad faith or abused its discretion and ordered that the terms of the trust be amended to provide for annual distribution of income and to provide for exclusion from private foundations status. By separate order, the court found that it was the decedent's intent that the selection of the beneficiary to receive the trust principal not be made until 15 years after his death. The court questioned the testimony of John Abdenshien concerning the rapid obsolescence of St. James Hospital, as modernized and renovated, and stated:

"[T]he passage of time may reveal a pressing need for a medical care facility in either Livingston or Woodford County. There is no need to determine the ultimate beneficiary of the corpus of this trust until November 23, 1992. Changes in medical technology, changes in the methods of delivery of health care, and changes in the manner of payment of medical care may require health care facilities of an entirely different nature than any facilities presently in existence. For these reasons the court finds that a determination of the ultimate beneficiary of the corpus of this trust should be deferred until the start of the next decade unless a catastrophe should occur requiring immediate replacement of an existing medical care facility in the interim."

The court declared the selection agreements between the trustee and The Sisters void and ordered that the income beneficiary be selected

annually subject to court approval. The court also ordered that the trustee accept proposals from charitable health care providers between January 1, 1990, and January 1, 1992, and make a report to the court of its selection.

BroMenn petitioned for attorney fees. The court declined to rule on the petition, pending the ultimate determination of the cause. The trustee, The Sisters, and the Attorney General appeal and BroMenn cross-appeals.

The appellants first argue that the trial court erred in setting aside the trustee's designation of The Sisters as beneficiary of the income and principal of the trust. They maintain that the trustee made a conscientious investigation and exercised its discretion in a reasonable manner and in good faith. In response, BroMenn argues that the trustee failed to exercise diligence and prudence and acted prematurely in selecting The Sisters as the ultimate recipient of the trust estate.

■■ A trustee's exercise of discretion is not subject to interference by the court in the absence of proof of fraud, bad faith or abuse of discretion. (*Continental Illinois National Bank & Trust Co. v. Sever* (1946), 393 Ill. 81, 65 N.E.2d 385; *Altschuler v. Chicago City Bank & Trust Co.* (1942), 380 Ill. 137, 43 N.E.2d 673; *Fischer v. Butz* (1906), 224 Ill. 379, 79 N.E. 659.) In *Fischer*, the court stated the rule as follows:

> " 'A court of equity will examine into the conduct of a trustee in the execution of his discretionary powers, and will assume control over the trustee's conduct, and, if need be, will take upon itself the execution of the trust. But the court will exercise this prerogative with great caution, and will not displace the trustee from exercising his functions unless, upon a consideration of the reasons and grounds upon which he has acted, it appears that he has abused his trust and that his acts in the premises have not been within the limits of a sound and honest execution of the trust.' " (224 Ill. 379, 383-84, 79 N.E. 659, 661.)

A court is not permitted to substitute its judgment and discretion for that of the trustee as long as his acts are within the bounds of reasonable judgment. *Martin v. McCune* (1925), 318 Ill. 585, 149 N.E. 489; *Graham Hospital Association v. Talley* (1975), 29 Ill. App. 3d 190, 329 N.E.2d 918.

Initially, we note that the trustee here, in selecting the beneficiary of the trust proceeds, may have been acting in part to avoid private foundation status. Although it is not clear from the record or briefs

whether this was the trustee's motivation in its early selection of the ultimate beneficiary, qualification as a supporting organization would be facilitated by specifying the charitable organization by name. The agreement between the trustee and The Sisters provides that the trustee was advised of the necessity of making the selection of the charitable organization to receive the trust funds prior to the expiration of the period fixed for distribution under the will. The record also indicates that the trustee has filed for exemption status with the Internal Revenue Service and that the Service has notified the trustee that it will act upon its application after resolution of these proceedings.

■ Under the Charitable Trust Act, a trustee is authorized to amend the terms of a trust to avoid private foundation status and may "reduce or limit" the charitable organizations or classes of charitable organizations which may be selected by the trustee. We conclude that the trustee was statutorily authorized to specify The Sisters as the income and principal beneficiary of the trust in order to qualify as a supporting organization under section 509(a)(3) of the Code.

The appellants contend that the trial court, having specifically found that the trustee did not act in bad faith, fraudulently, or abuse its discretion, could not interfere with its selection. The appellants rely principally on *Graham Hospital Association* and *Continental Illinois National Bank & Trust Co.*, which they claim to be both instructive and factually similar. In *Continental Illinois National Bank & Trust Co. v. Sever* (1946), 393 Ill. 81, 65 N.E.2d 385, the provisions of the testamentary trust provided for the establishment of an educational institution, the location of which was left to the trustee's discretion. The trustee applied to the court for assistance in performing its duties and the order rendered by the court provided that the location of the educational institution was left to the discretion of the trustee and provided that the trustee may select an existing institution. Thereafter, the trustee selected Washington University as beneficiary. The trustee's selection was set aside by the trial court, which found that it was necessary to apply the *cy pres* doctrine in order to give effect to the overall charitable intent of the testator and decreed St. Louis University as the beneficiary of the trust fund.

On appeal, the appellate court reversed and the supreme court affirmed that ruling, noting the rule that a court will not exercise a discretion which has been vested in the trustee. The court stated that no appeal had been taken from the trial court's earlier order determining that the selection of the beneficiary was left to the trustee's discretion and concluded that there was no basis in the pleadings for the

court to apply the *cy pres* doctrine.

In *Graham Hospital Association v. Talley* (1975), 29 Ill. App. 3d 190, 329 N.E.2d 918, the terms of a charitable trust provided for the erection of a hospital in Fulton County not later than 15 years after the death of the grantor or his daughter. Prior to the expiration of the 15-year period, the hospital brought an action seeking distribution of the assets to it under the doctrine of *cy pres*. The trial court held that the hospital's action was premature.

On appeal, the court found that the trial court's determination concerning the feasibility of constructing a hospital to be fully supported by the record. The court noted, however, the broad discretionary powers granted to the trustees "to choose when and how to carry out the trust" and concluded that, until the expiration of the 15-year period, the determination of the proper use of the trust property rested not with the court but with the trustees.

Neither case is dispositive of the issue presented here although both illustrate the reluctance of courts to interfere with the trustee's exercise of a discretionary power. At issue here is the reasonableness of the trustee's actions in selecting The Sisters as the beneficiary of the trust funds.

Under the terms of the decedent's will, the trustee is authorized to select a charitable organization or trust which either (1) *operates* a hospital in Livingston or Woodford Counties or (2) has as its charitable purpose the operation of a hospital in Livingston or Woodford Counties. The decedent specified that the charitable organization or trust shall use the trust funds "as it sees fit, provided said proceeds shall only be used to purchase, build, repair, remodel, maintain or operate a hospital at the location and in accord" with the trustee's selection. The decedent expressed his desire that the hospital be located in Livingston County near the community of Flanagan, or, if such location is not practical, that it be located in Woodford County near Minonk, or in another suitable location in either Livingston or Woodford County. The terms of the will do not specify when the selection of the beneficiary shall be made. At the time the trustee made its selection, there were two hospitals in Livingston County. In addition to St. James Hospital in Pontiac, an 84-bed hospital is located in Fairbury in Livingston County. Eureka Hospital, a 42-bed facility, is the only hospital located in Woodford County. The evidence introduced at the hearing overwhelmingly established that approval for the construction of a hospital facility for the purpose of adding additional beds in either Livingston or Woodford Counties could not likely be obtained.

On February 2, 1984, the Illinois Health Planning Board approved The Sister's application for renovation of St. James Hospital in Pontiac. The renovation consisted principally of the following: modernization of medical/surgical inpatient bed areas and intensive care unit; discontinuation of separate pediatrics unit; establishment of outpatient ambulatory surgery; and relocation and modernization of numerous ancillary services; and was undertaken to correct cited deficiencies in order to meet licensing and certification standards. The estimated cost of the project was $4,334,650.

Under the terms of the charitable selection agreements and addendum thereto entered into between the trustee and The Sisters, the net income from the trust was to be distributed annually to The Sisters, who agreed to use said funds for St. James Hospital, and, to the extent possible, to accumulate them for the eventual replacement of the facility. The trustee, upon the termination of the trust, will distribute the balance of the trust funds to The Sisters to be used for the construction of a new hospital facility and medical complex near the intersection of I-55 and Illinois Route 116 west of Pontiac in Livingston County. The agreements further provide that if The Sisters are unable to obtain the necessary certificate of need from the Illinois Health Facilities Board, the agreement may be cancelled at the trustee's option.

In support of the trustee's early selection of The Sisters as the ultimate beneficiary of the trust funds is the testimony of John Abdenshien that despite the current renovation, St. James Hospital will need to be replaced or undergo major renovation within a 20-year period. The proposal submitted by A.T. Kearney recommended that primary consideration be given to the construction of a replacement hospital for St. James. Factors listed in favor of this alternative are a need for renovation of the hospital's physical plant, the unfavorable location of the current facility in terms of its serving area trauma needs, and future population growth movements.

Sister Masching testified that St. James Hospital was built in 1907. Although the facility was gutted by fire in 1919, the original exterior walls remain in a portion of the building. The interior was rebuilt in 1920 and additions were constructed in 1924 and 1952. No construction has occurred since 1968 through 1970. Although the alternative of building a replacement hospital was rejected by The Sisters at the present time because of financial reasons, The Sisters testified that they intend to replace the hospital in time.

As noted by The Sisters in their brief, the testimony of Thomas B. Johnson, BroMenn's expert, concerning the financial feasibility of

replacing St. James Hospital is subject to some criticism. Primarily, Johnson stated that he has no background or expertise in acute care facilities with regard to suitability of physical structures and that his testimony was confined to an analysis of financial information. Additionally, Johnson's financial analysis failed to take into consideration the net income from the trust to be distributed to The Sisters as well as the income earned thereon prior to the date of the anticipated construction. Johnson also employed an 11% interest rate in making his calculations whereas The Sisters testified that the funds may be available for borrowing at the rate of 7%.

The public opinion survey conducted by Market Facts revealed that residents of Flanagan, Minonk, and Graymont preferred the option of replacing St. James Hospital over the construction of a combined nursing care/residential facility by a six to 10 margin.

In our view, the trustee made a conscientious investigation and exercised its discretion reasonably and in good faith. If The Sisters are unable to obtain a certificate of need for the replacement of St. James, *i.e.*, it is determined that replacement is not financially feasible, the trustee is given the option to cancel the agreement. At that time and in that event, the trustee could, within the terms of the will, determine to distribute the funds to The Sisters to make any renovations or repairs needed at that time. As noted earlier, specifying the charitable beneficiary may facilitate or enable the trust to qualify as a supporting organization and thereby avoid private foundation status.

The trustee argues that the trial court exceeded its authority in requiring annual selections of the recipient of the current income, a delayed selection of the ultimate beneficiary of the trust funds, and court approval of each selection. By order entered November 7, 1984, the trial court voided the charitable selection agreements between the trustee and The Sisters and ordered as follows:

"(3) That the trustee shall annually give notice; and accept proposals from charitable health care providers or charitable organizations desirous of becoming health care providers for grants from the annual income of the trust for providing medical care services in either Livingston County or Woodford County or both; and make a selection of the organization or organizations whose proposals seem most closely to conform to the intent of the testator as expressed in his will and codicil; and make a report of said selection to the court at the time of submission of its annual report, which selection and report shall be subject to the approval of the court; and in default of receiving any proposals, or making of a selection, or submission of a

selection which can be approved, or which can be approved within such additional time as the court may from time to time allow, shall pay over to BroMenn Healthcare the current income for that year or that part of the current income for that year which remains uncommitted to an approved grant;

(4) That the trustee shall between January 1, 1990 and January 1, 1992 give notice; and accept proposals from charitable health care providers or charitable organizations desirous of becoming health care providers for grants from the corpus of the trust for providing medical care services in either Livingston County or Woodford County or both; and make a selection of the organization or organizations whose proposals seem most closely to conform to the intent of the testator as expressed in his will and codicil; and make a report of said selection to the court at the time of submission of its annual report, which selection and report shall be subject to the approval of the court; and in default of receiving any proposals, or making of a selection, or submission of a selection which can be approved, or which can be approved within such additional time as the court may from time to time allow, shall pay over to BroMenn Healthcare the corpus of the trust or that part of the corpus of the trust which remains uncommitted to an approved grant, provided that proposals may be accepted by the trustee prior to January 1, 1990 in the event of a catastrophic event herein above described."

The following general rules govern the judicial control and supervision of trusts:

"Although the discretion of a trustee is subject to the control of the court, the court will not assume that the trustee will abuse the discretion lodged in him in the management of the trust estate, and will presume that a settlor reposing a discretion in a trustee knew that human judgment is not infallible. Accordingly, the court will not, of its own motion or at the instance of interested parties, ordinarily, interfere with the performance of his duties by the trustee and the exercise of the discretionary powers conferred upon him. The court will, however, interfere with the exercise of a trustee's discretion where there is shown bad faith on his part, fraud, malice, misbehavior, misconduct, abuse of authority, a gross and arbitrary abuse of discretion, or where on the part of the trustee or fiduciary there is a complete or arbitrary refusal to act in the premises, or acting in a state of mind not contemplated by the settlor, or

failure to exercise discretion in a reasonable manner.

So, too, the court will control the exercise of a trustee's discretion where an intention of the settlor that the execution of the trust shall be under the supervisory control of the court is manifest in the instrument creating the trust, where it is requested to do so by the trustee or by the cestui que trust with his consent, where it will prevent a multiplicity of suits, when it is shown by circumstances that it is for the benefit of the trust estate not to permit him to exercise his discretion, or where the actions of the trustee would defeat a purpose of the trust; and, whenever the law determines that the discretion of a trustee should be exercised in a particular way, he will be constrained to act in accordance therewith.

The court will also interfere with the exercise of his discretion by a trustee on his failure properly to exercise his discretion because of a misunderstanding of his duties, or where in exercising his discretion he disregards the wishes of the creator of the trust, or where the discretion is so administered that it fails to accomplish the purpose for which the trust was created." 90 C.J.S. *Trusts* sec. 261, at 308-10 (1955).

As noted by the appellants, the intent of the decedent was the selection of a single organization or trust for the purpose of constructing a hospital or nursing home, and the plan for an annual selection mandated by the trial court would not appear to accomplish his intent.

Again, the scheme of the trust emphasized the accumulation of income in apparent contemplation of creating a fund which might produce a much larger charitable facility than that which would result with the annual distribution of income. The testamentary documents contain no suggestion of any purpose for the 20-year period of the trust other than the accumulation of income. That purpose is frustrated by the present tax legislation.

BroMenn argues that the trial court erred in directing that all accumulated income from the estate and trust be subject to the same provisions for distribution of future income as set forth in its order of November 7, 1984, and that the income earned prior to the invalidation of the agreements between the trustee and The Sisters should be awarded to it on a default basis. BroMenn maintains that as no recipient was selected by the trustee from the date of the decedent's death until 1984, BroMenn is entitled to such income as the contingent beneficiary.

This argument seems to be wholly without merit. Not only

does it disregard the fact that the trust was not funded as of the date of the decedent's death, it fails to take into consideration that the will provides only that the trust funds be paid to BroMenn 21 years after the decedent's death *in the event* that the trustee determines that it is unwise or impractical to locate a hospital or nursing home in Livingston or Woodford Counties.

■ We agree with the finding of the trial court that there is no evidence suggesting that the trustee has acted in bad faith, fraudulently, or arbitrarily. In the light of such finding, the sole discretion conferred upon the trustee by the will, and upon the authorities noted, we conclude that the portion of the order voiding the charitable selection agreements was an abuse of judicial discretion.

BroMenn argues the trial court erred in declining to rule upon its petition for attorney fees. BroMenn contends that it was justified in filing its counterclaim in order to protect its interest under the will and to promote the proper administration of the trust and thus was entitled to fees. The appellants argue that BroMenn's counterclaim was unwarranted and served only to impede the proper administration of the trust and thus its claim for attorney fees should be denied.

■ In *Wool v. La Salle National Bank* (1980), 89 Ill. App. 3d 560, 564-65, 411 N.E.2d 1135, 1139, the court discussed the general rule regarding allowance of attorney fees, stating:

> "[E]xpenses incident to the preservation of a trust or for the benefit thereof are properly chargeable against and reimbursable from the trust estate. (*Brown v. Commercial National Bank* (1968), 94 Ill. App. 2d 273, 280, 237 N.E.2d 567, *aff'd* (1969), 42 Ill. 2d 365, 247 N.E.2d 894.)
>
> *** Elucidation of what became the *Brown* rule, found in earlier cases, indicates that the focus is whether there has been a successful suit which saves a trust from destruction [citation], or which preserves, protects, and increases a common fund or property or creates a fund from which others may share [citation]. The crux of these cases appears to be that the trust as an entity is protected or increased in tangible form, either monetarily or with property."

The assessment of fees is not conditioned upon the outcome of the litigation. *Brown v. Commercial National Bank* (1968), 94 Ill. App. 2d 273, 237 N.E.2d 567.

■ Treating the trial court's ruling as a denial of attorney fees, we find no error as suggested in the cross-appeal. In the context of *Wool*, the counterclaim did not serve to increase the trust fund, nor would it preserve the fund. There was no actual construction of am-

biguous language, and no real challenge to the imperative need to qualify the testamentary trust under the requirements of the present tax regulations. BroMenn's counterclaim was essentially to contest the exercise of discretion conferred upon the trustee and an attempt to substitute a plan of its own.

The order setting aside the beneficiary agreements and imposing requirements for the selection of temporary beneficiaries of the trust is reversed. As we have treated the trial court's failure to rule on BroMenn's petition for attorney fees as a denial of such fees, we affirm that ruling.

Affirmed in part and reversed in part.

McCULLOUGH, P.J., and GREEN, J., concur.